CAHILL, EXECUTOR, ET AL. *v.* CLIVER ET AL.

[No. 18,053.  Filed April 26, 1951.  Rehearing denied June 19, 1951.  Transfer denied January 9, 1952.]

*Dewey & Nattkemper; Aikman, Piety & McPeak,* both of Terre Haute; and *Fansler, Fauvre, Young & Chambers,* of Indianapolis, for appellants.

*Mann, Stohr & Mann;* and *Jerdie D. Lewis,* both of Terre Haute, for appellees.

ACHOR, J.—This is an action begun by James Lawrence Cliver to contest the will of his Aunt, Jessica Sage, deceased. May C. Dodson, sister of the deceased and C. Owen Dodson, a nephew and legatee under the will, thereafter were joined as parties plaintiff and defendant respectively. The appellants are devisees, executors and trustees under the will and/or pursuant to order of court.

The complaint alleged that the will is invalid because of the unsoundness of mind of testatrix; that both the will and codicil were procured by undue influence, and were unduly executed.

The appellants filed an answer which admitted the formal allegations of the complaint, but specifically denied that the testatrix was of unsound mind at the time of the execution of the will, or that it was obtained by undue influence, or that it was unduly executed. Upon these issues the cause was submitted to the jury which returned a verdict for appellees.

There was judgment setting aside the will and in this appeal the appellants assign error in the over-

ruling of the motion for a new trial. The causes for new trial specifically assigned were:

1. That the verdict is not sustained by sufficient evidence.

2. That the verdict is contrary to law.

3. That the court erred in refusing to give defendants' instruction 1, withdrawing the issue of unsoundness of mind from the jury.

4. That the court erred in refusing to give defendants' tendered instruction 2, withdrawing the issue of undue influence from the jury.

The record reveals great conflict in the evidence on the issues involved. However, finding and judgment having been for the plaintiff, the consideration of this court is limited to a review of the evidence most favorable to the plaintiff and a determination therefrom whether that evidence, together with the inferences which may reasonably have been drawn therefrom, were sufficient to sustain the finding and judgment or whether reasonable men were bound to reach a decision contrary to that reached by the jury in the court below.

A partial recital of the evidence most favorable to appellee on the subject of the unsoundness of mind of the testatrix is as follows: Testatrix was a delicate and sensitive child. Because of her health and temperament she did not take regular employment but privately tutored children. In 1906, at the age of 35, she married Col. William E. McLean, a distant relative, who was 74 years of age. He died only a few days thereafter, leaving her an estate of $250,000. In 1916 her mother died, and in 1918 her father and brother died. As a result of these tragedies, she suffered a nervous collapse and thereafter, until a few weeks before her death in April, 1948, she believed her sister wanted to confine her to an asylum. She lived in a house which was not painted

from the time of her mother's death in 1916 until her own death in 1948. She explained that her mother had selected the paint and she did not want to change it. She caused iron bars to be installed in all the downstairs windows and had numerous locks placed on all the doors, both outside and between the various rooms of the house. The windows were screwed tight to the casings so they could not be opened. The wallpaper in the house was old, loose and dirty. The house was meagerly lighted with drop-cords and the smallest possible light bulbs in each room of the house. She collected great quantities of useless items. She kept a pet robin, which flew about the house unrestricted. She constructed traps with which she caught cats, which she kept in her garage and thereafter chloroformed. She met one of her cleaning women at the door and said, "What would you do if I cut you up?" Although she had large quantities of soap she would allow her to use practically none. She locked her cleaning woman in the rooms that she was cleaning. She attended her brother's funeral in 1918 and contributed $200 to his funeral expenses. Nevertheless, in 1943, she made an affidavit under oath that his residence was unknown to her. She made a similar statement to a neighbor who questioned her about her brother. Although her estate consisted of nearly a quarter of a million dollars, in writing her will she did not mention her nephew, the appellee James Lawrence Cliver. An expert medical witness testified in answer to a hypothetical question that at the time of the execution of the will she did not have "sufficient mental capacity to note the natural objects of her bounty and their deserts in relation to their treatment of the testatrix and retain these facts long enough to direct the preparation of and sign codicil to last will."

We cannot say that there was no evidence of unsoundness of mind upon which reasonable men might differ so as to justify withdrawal of the case from the jury. The court did not err in refusing defendants' instruction number 1.

Is there sufficient evidence in the record to sustain the verdict on the issue of undue influence? As was true in the case of *Haas* v. *Haas* (1951), 121 Ind. App. 335, 96 N. E. 2d 116, at page 344, the court said: ". . . there is no direct and positive evidence of undue influence in this case. No witness saw or heard any one exercise any control over the will of the testator through force, threats, cajolery, flattery or other methods." However, as stated in that case, ". . . Such evidence, however, is not necessary. Undue influence may be proven by circumstantial evidence and the only positive and direct proof required is of facts and circumstances from which undue influence may reasonably be inferred. *Davis* v. *Babb* (1921), 190 Ind. 173, 125 N. E. 403; *Workman* v. *Workman* (1943), 113 Ind. App. 245, 46 N. E. 2d 718."

A recital of the evidence most favorable to appellee on the subject of undue influence is as follows: Medical testimony was introduced to the effect that decedent's physical and mental condition was such as to make her abnormally susceptible to influence; that appellant Cahill made as many as eight or twelve extended visits to the home of decedent each year over a period of the last ten years; that their conversations involved her affairs, including the writing of her will; that they were not social in character. That Cahill, with decedent's consent, engaged his personal attorney to write the will. Cahill was present with the decedent and the attorney at all conferences regarding the will, and that he and his attorney conferred privately about the will.

By her previous but unexecuted will and during numerous conversations with Cahill, decedent had expressed a desire to establish a home for old men in Terre Haute, as a memorial to her deceased husband, similar to the old ladies home then in existence. However, after discussing the building of such a home with Cahill and his attorney Dewey, she agreed merely to establish a trust for the benefit of such old men and to name Cahill as trustee of the trust. However, the will, as written by Attorney Dewey after conferences with Cahill, did not make "old men" the beneficiaries of the trust but instead it named "worthy poor men" as the beneficiaries thereof.

Prior to the writing of the will, decedent told both Cahill and attorney Dewey that she had not made up her mind as to whom she wanted to name as successor to Cahill as trustee. However, when the will was drafted it provided that Cahill name his own successor.

When decedent read the will as written she told attorney Dewey that she wanted several changes made and that attorney Dewey made notations thereof on a yellow sheet of paper. Nevertheless, when Cahill called upon decedent she signed the will without any of the requested changes having been made. Thereafter Cahill kept the will in his vault of his bank, where it was accessible to the decedent only with his knowledge.

Although the estate involved approximately a quarter of a million dollars, still the provisions regarding the trust were so written by Cahill and Dewey as to vest Cahill as trustee, with unlimited authority to sell, dispose of, encumber or change the trust estate without order of court, to choose the beneficiaries thereof and to name his own successor. The provisions of the will regarding the naming of the recipients or beneficiaries of this large estate were so indefinite yet unrestricted

and absolute in Cahill that it might well include all his own "worthy poor men" friends and relatives.

The extent of the influence exercised by Cahill over the decedent is demonstrated by the fact that a few days prior to her death he induced her to sign a deed to a house and lot in one of the better residential districts of Terre Haute to a banker friend of his for the mere cost of the lot.

We conclude that there was evidence of probative value on the issue of undue influence before the jury. That the court therefore did not err in refusing to give appellants' instruction 2. That the evidence was sufficient to sustain the verdict. That it was not contrary to law.

Judgment affirmed.

NOTE.—Reported in 98 N. E. 2d 388.